ISABELLA McCOWN ET AL. v. MARTHA E. OWENS ET AL.

Delivered February 25, 1897.

**1.   Husband and Wife—Marital Rights—Descent and Distribution.**

Under the act of the Congress of the Republic approved January 20, 1840, section 13, providing that the "marital rights" of persons married in another country, who removed to Texas before the passage of the act, should be regulated by the law as it previously was, it is held that the term "marital rights" does not include the mere capacity of one spouse to take the property of the other after the marriage relation has been ended by death; and therefore, under section 4, the survivor of the community was entitled to the remainder of the community property, after payment of debts, there being no children, without reference to the date of removal.

**2.   Will—Construction—Devisees.**

Where a will directed that community property should go according to the law, and the law was that the widow should take the whole, the fact that the will in terms excludes one sister of the testator does not evidence an intention that his estate should go to the brothers and sisters not named.

APPEAL from Grimes.   Tried below before Hon J. M. SMITHER.

*W. L. McDonald,* for appellants.—The marital rights of persons married in another country, who removed to the Republic of Texas and acquired community property here during the marriage, prior to and after the passage of the Act of January 20, 1840, entitled, "An Act to Adopt the Common Law of England, to Repeal Certain Mexican Laws, and to Regulate the Marital Rights of Parties," were "regulated by the law as it aforetime was"—i. e., the Mexican or Spanish civil law. Under the Spanish civil law in force in Texas as to all persons prior to 1840, where a husband died intestate, leaving no "descendants or ascendants," but leaving a wife and collat- eral kindred surviving him, his collateral kindred were his heirs and took his half of the "ganacial goods" or community property; and the act of the Congress of the Republic of Texas of December 18, 1837, amended the Spanish civil law, so that, as therein stated, "in case any husband or wife shall die intestate and leaving no heirs, the survivor shall be the heir and shall inherit the estate of the deceased spouse." In Texas, prior to the passage of said Act of December 18, 1837, the husband or wife could not, under any circumstances, be the heir to any part of the other's property, or "inherit the estate of their deceased spouse;" but, in the event there were no other surviving relatives of the deceased, within a certain degree, to inherit the estate, it went, accord- ing to the Spanish civil law, then in force in Texas, "to the public treasury to be applied to objects of public utility." Hart. Dig., arts. 2419, 2425; Pasch. Dig., arts. 4645, 4642; Revised Statutes, 1879, arts. 1653, 1645 (3); Sayles' Early Laws, vol. 1, art. 124, secs. 1, 5; Id., art. 435, sec. 2; Id., arts. 118, 121, secs. 1-6; Scott v. Maynard, Dallam, 548; Smith v. Smith, 1 Texas, 621; Cartwright v. Hollis, 5 Texas, 152; Reese v. Hicks, 13 Texas, 162; Babb v. Carroll, 21 Texas, 765; Thomp- son v. Cragg, 24 Texas, 600; 33 Texas, 513; Sparks v. Spence, 40 Texas, 694; Veramendi v. Hutchins, 48 Texas, 550; Boone v. Hulsey, 71 Texas, 189; Van Sickle v. Catlett, 75 Texas, 404; Routh v. Routh, 57 Texas, 589; 54 Texas, 25; 78 Texas, 664; Sayles' Texas Real Estate Laws, vol. 2, secs. 581-763, et seq.; Buckler's Texas Dig., vol. 1, pp. 337, 407, 612, 613; Id., vol. 3, p. 178; Ballinger on Community Property, secs. 5, 6, 9, 15 16, 36, 217, 222, 257, 262; Stewart on Husband and Wife, sec. 319; Bouvier's Law Dictionary, vol. 1, p. 350; Id., vol. 2, pp. 153, 596.

*Wilson & Wood,* for appellees.

WILLIAMS, Associate Justice.—The only question presented on this appeal which we find it necessary to consider is that arising from the action of the court below in sustaining a general demurrer to plain- tiffs' petition and dismissing the cause. The facts upon which our de- cision rests, as stated in the petition, are few. The appellants sued to obtain a construction of the will of Alexander McCown, deceased, and to recover one-half of the community estate of Alexander McCown and

his wife, left at the death of the former, which plaintiffs claim under such will.

Alexander and Nancy McCown were married in Alabama prior to 1838, and in that year, or 1839, moved to Texas, where they ever afterwards, until their deaths, resided. They accumulated the property in question in this suit as their community estate, and in 1855 Alexander McCown died, leaving a will, of which the following is a copy:

"Estate of Alex McCown, Dec'd.
        "By
"P. J. Willis & Nancy McCown, Exrs.

"The last will and testament of Alex McCown, of Montgomery Co., Texas, witnesseth:

"1st.   That I, the said testator, do hereby appoint my beloved wife, Nancy McCown, and my worthy and trusty friend Peter J. Willis, executors of this my last will, and I direct that the County Court have nothing to do with my estate or its settlement, other than the probate and registry of my will and an inventory of my estate, and should my friend P. J. Willis decline assisting my wife in the execution of this trust, then I direct that my said wife be not required to give any bond for the execution of this will.

"2nd.   I direct that all my just debts be paid as soon as possible, for which my executors shall have all power to raise funds out of my effects that a court would give them, and for this purpose to sell and convey lands or other property.

"3rd.   My wife's separate property, all of which consists of slaves, is of record, except the negro woman Dinah, I direct shall not be interfered with.   I also give her the household furniture.

"4th.   The balance of the property being community, I direct shall go according to law, except my sister Tirzah Birdwell, having no children and being well-to-do, shall be excluded from any share in my estate.

"Given under my hand and seal this 26th day of Sept., 1855.
        "[Signed]                ALEXR McCOWN.        ⌈Seal⌉"

There were no children or descendants, father or mother, of McCown, surviving him, but he left several brothers and sisters, besides the children of a deceased brother; and it is the claim of these collateral kindred that is represented by plaintiffs. Defendants are the heirs and representatives of Nancy McCown, who survived her husband.

Appellants contend that, by the law regulating the descent of McCown's half of the community estate, it would, in the absence of a will, have descended to his brothers and sisters and the children of the deceased brother; and that, hence, by the fourth clause of the will, providing that it should "go according to law," it was bequeathed to them. This contention is based upon the thirteenth section of the Act of the Congress of the Republic, approved January 20, 1840, "To adopt the

common law of England, to repeal certain Mexican laws, and to regulate the marital rights of parties."

As is well known, by the first section of the Act the common law, as far as not inconsistent with the Constitution or the acts of Congress, was introduced into the Republic as the rule of decision. By the second section the laws in force prior to September 1, 1836, with certain named exceptions, were repealed. By the third and fourth sections the separate property of the wife, after marriage, and the community property of the spouses, as well as the powers of the husband over both, were defined; and by the latter part of the fourth section it was provided: "Upon dissolution of marriage, by death, after the payment of all such debts (community), the remainder of such common property shall go to the survivor, if the deceased have no descendant or descendants; but if the deceased have a descendant or descendants, the survivor shall have one-half of such common property and the other half shall pass to the descendant or descendants of the deceased." The fifth, sixth, seventh and eighth sections regulate the subject of matrimonial agreements between parties intending to marry. The ninth section empowered the husband, either alone or jointly with the wife, and, in case of his failure, the wife, by authority of the court, to sue for the recovery of the effects of the wife. The tenth section provided for the support of the wife and nurture and education of the children, under order of court, in the absence of proper provision made by the husband. The eleventh section provided for the recovery by the wife, after dissolution of marriage, of her separate property illegally disposed of, and regulated the limitation of such actions. The twelfth section is as to the presumption that property possessed at the dissolution of marriage is community.

The thirteenth, the section relied on, is as follows: "Sec. 13. Be it further enacted, that marriages that may be entered into in this Republic after the passage of this law shall be governed by the provisions of the same. The marital rights of persons married in other countries, who may remove here after the passage of this act, shall, in regard to property acquired in this Republic during the marriage, be regulated by the provisions of the same. The marital rights of persons married here before the passage of this act, or of persons married in another country, who removed here before its passage, shall be regulated by the law as it aforetime was."

It is claimed that, by the provisions of this section, the rule prescribed for the descent of community property by the portion of the fourth section above quoted, is restricted in its operation to cases in which the parties were not married and living in the Republic prior to the taking effect of this statute; and that, in such cases, the title was made to descend according to the law as it was before. If this is true, the brothers and sisters, and not the wife, of the deceased husband would have inherited his half of the common estate.

Under the Mexican law, as it has been declared in the decisions of

the Supreme Court, the wife did not inherit from the husband, but the property, in the absence of closer kin, went to collateral kindred; and, if there were none such, it went into the public treasury. While the Act of 1837 extended the right of inheritance to the wife, it was only when the husband left no other heirs. But by the fourth section of the Act of 1840 a new order for the descent of community property was provided, and it applied to and controlled the devolution of the estate in question, unless it should be held that the capacity given to the wife to take from the husband is included in the words "marital rights" used in the thirteenth section.

Before the passage of the Act of 1840, the descent was cast upon the blood relatives of the decedent, to the exclusion of the wife, and it cannot be held that such rights as would accrue to the heirs under that rule were intended by the words "marital rights." If the congress had intended to preserve to the blood kin of the parties, married and living here before the law was enacted, the inheritance which the former law had provided for them, it most assuredly would have employed different language to express its intention. The words "marital rights" have a tolerably definite legal signification, which is not believed to be different from that given to them in popular usage. Bouvier defines "marital" as "that which belongs to marriage; as marital rights, marital duties." Black gives substantially the same definition, with another, found in Webster and Wharton, viz: "Of or pertaining to a husband, as marital rights, duties, authority."

There is nothing in the statute to indicate that these words were carelessly used, or that they were intended to have other than their ordinary meaning. On the contrary, the verbiage of the law appears to have been carefully chosen. It cannot be assumed that, because the capacity of the surviving spouse to inherit from the deceased is given in the same act, that therefore it is one of the rights mentioned in the thirteenth section. In one way and another, a vast number of rights, powers and duties are regulated by this law, many of which are plainly not covered by that language; while there are rights defined to which it has direct and appropriate application.

In our opinion, by the term "marital rights" was meant only those rights which pertained to the existing status of husband and wife, and that the mere capacity of one to take the property of the other, after that status had been ended by death, is not included. This capacity, so to speak, would not be properly called a right. No right to take the property of a decedent by descent could exist in any one until after his or her death, and then it would become a vested right of property only by operation of the laws in force. The clause of the fourth section given above is properly classified as a rule of descent and distribution. Other provisions are properly rules regulating marital rights. These two subjects are distinct in legal classification. The thirteenth section applies to one subject, and the fourth section to the other. In the eleventh section is found a law regulating limitation, and by other sec-

tions an almost infinite variety of subjects is affected. During the continuance of the status, the husband and wife each has rights and owes duties which are given or imposed by the law. These are their marital rights and duties. On the death of either the marital duties are at an end, and the rights of property are vested titles, those belonging to the survivor continuing, and those which had belonged to the deceased vesting in the persons appointed by existing law to take them.

This descent may be cast upon the wife or other persons as the law may provide. Under the statute in question it would go first to children or descendants, and then to the widow. Why should a law giving the wife such a capacity be denominated one regulating a marital right, when the property may descend upon another? The nature of the provisions in the thirteenth section indicates the purpose of Congress. If persons should marry in the Republic, after its passage, their marriage would be properly subject to the authority of Congress, and therefore it was the "marriages" that were to be governed by the law. If the marriage took place, either before or after the law took effect, in another country, it was subject to the laws of that country, and hence it was not attempted to govern the marriage itself; but, after the parties should come to the Republic, their marital rights in regard to property acquired here would be subject to our laws, and so it was provided. Marriages contracted here before the passage of the act were entered into under different laws, by which rights were conferred, and it was not thought proper to disturb them. But no right to inherit from a living person had become fixed under any law, and no reason can be suggested why the law regulating the descent of property belonging to persons who should afterwards die should be made to depend on the date of the marriage.

But it is further contended that, even if the law did not cast the descent on the collateral kindred of McCown, but upon his widow, the will shows an intent that the former should have the testator's half. The will says in plain terms that the property shall go according to law, and there is nothing in the other provisions which conflicts with that direction. The will is short and simple. The purposes of the testator were, to appoint executors, in order that regular administration in the courts should be unnecessary; to provide for the payment of debts, and to invest the executor with powers adequate to that end; to define the separate property of the wife, so that it and the household furniture, neither of which were subject to community debts, might be left undisturbed. After this was done the testator was content to leave the disposition of the community property to the law, provided that none of it should go to the sister named.

The fact that this sister is named in the will is relied on as evidencing the intention of the testator to devise his estate to the brothers and sisters not named. We think it is enough to stop speculation by the court, that no such intention is expressed. Of course, the intention of the testator must govern, but by this is meant an intention expressed in the will. It may be ascertained by construction of doubtful terms and

provisions, but it must nevertheless appear from the language used in the will. The intention here is plainly expressed that the estate shall go according to law. At the same time, it is provided that Mrs. Birdwell shall receive no part of it. If it be admitted that this was a useless provision, it could not be held to overcome the other direction.

One of three states of mind must be imputed to the testator, viz: First, he knew that the descent would be cast upon the widow; or, second, he believed that it would be cast upon his blood kindred; or, third, he had no knowledge or opinion on the subject. Whatever be the assumption made, he contented himself with leaving the disposition of the property to the law. If he knew it would thus go to his wife, he intended that it should. Is he believed that it would go to his brothers and sisters, he made no provision that it should go to them, contrary to the law; and the court cannot know what direction he would have given had he possessed better information. If he had no belief upon the subject, he was nevertheless willing that the law, whatever it might be, should control.

The exclusion of Mrs. Birdwell is not inconsistent with either assumption. Under the first, the testator might have died after his wife did, in which case there would have been necessity for this provision of the will. We cannot assume that he knew that his wife would survive him. The fact that he died within a few days after the execution of the will does not prove that he did. Her death was an event which would happen in the future and he could not know when it would take place. It is not uncommon to provide in wills for conditions that are not expected to arise. Under the second, it would follow that the testator so excluded Mrs. Birdwell because he thought the law would devolve the estate upon his brothers and sisters; but, as he does not by the will bequeath to them, without the aid of the law, it does not follow that he would have done so had he known the law to be otherwise than he supposed it to be. The court cannot so assume, without striking out the positive direction that the property should go according to law, and inserting another which the will does not contain. Under the third assumption, the exclusion of Mrs. Birdwell would be explained as inserted out of abundant caution, in the testator's ignorance of the course the property might take under the law. The erased clause of the will should not, we think, be considered for any purpose; but, if it were, it certainly does not aid plaintiffs' case. If the unfinished sentence might be considered as showing a purpose of the testator to divide his property among unnamed persons, the fact that it was never finished, but was erased and another provision inserted in its place, would show even more strongly the abandonment of such purpose. In no view that can be taken do the plaintiffs show a right to any portion of the property. The general demurrer was properly sustained.

*Affirmed.*